IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ANTHONY LEROY PIERCE,                    §
                                         §
              Petitioner,                §
                                         §
v.                                       §
                                         §      CIVIL ACTION NO. H-07-1561
NATHANIEL QUARTERMAN, Director,          §
Texas Department of Criminal             §
Justice-Correctional                     §
Institutions Division,                   §
                                         §
              Respondent.                §


**<u>MEMORANDUM OPINION AND ORDER</u>**


Petitioner Anthony Leroy Pierce, currently in the custody of the Texas Department of Criminal Justice ("TDCJ"), filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2254. Pierce was convicted of capital murder and sentenced to death for the murder of Fred Eugene Johnson during a robbery. This case is before the court on Pierce's amended petition for writ of habeas corpus (Docket Entry No. 8), Respondent Nathaniel Quarterman's motion for summary judgment (Docket Entry No. 12), Pierce's response to Quarterman's motion for summary judgment and counter-motion for partial summary judgment (Docket Entry No. 15), and Pierce's supplemental petition for writ of habeas corpus(Docket Entry No. 32).[1]  Having carefully considered the Amended and Supplemental

---

[1]     In an order granting in part Pierce's motion for discovery, this Court gave Quarterman 20 days after Pierce filed
(continued...)

Petitions, the Summary Judgment Motions, and the arguments and authorities of counsel, the court concludes that Quarterman's Motion for Summary Judgment should be granted in part and denied in part, Pierce's Amended Petition for Writ of Habeas Corpus should be granted in part and denied in part, and Pierce's Counter-Motion for Summary Judgment With Respect to his Penry claim should be granted.

## I.  **Background**[2]

On August 4, 1977, Fred Johnson was the manager of a Church's Fried Chicken restaurant. Brenda Charles was a cook and cashier that night, and Ron Cooks was a cook. After 9:00 that night, Pierce entered the restaurant, approached the cashier, exhibited a gun, and demanded money from Johnson. Johnson put the money into a Church's chicken box and handed the box to Pierce. Pierce ordered the employees to lie on the floor. As Pierce began to leave the restaurant, he dropped the box, spilling the money. He instructed Cooks to pick up the money. After Cooks did so, Pierce returned to the counter and told Johnson that he had been "laying to kill him". He then shot Johnson and fled the store.

---

[1](...continued)
any amendments to his amended petition in which to amend his summary judgment motion.  Pierce filed his supplemental petition on July 1, 2008, but Quarterman did not amend his summary judgment motion.

[2]     The facts of this case are largely drawn from the Texas Court of Criminal Appeals's ("TCCA") decision affirming Pierce's conviction and sentence.  See Pierce v. State, 777 S.W.2d 399, 401-02 (Tex.Crim.App. 1989).  Where this opinion diverges from or expands upon the TCCA's opinion, it will be denoted by a specific citation to the record.

At trial Charles testified that she recognized Pierce as the man who robbed and killed Johnson. She also testified that she recognized Pierce as someone who was in the restaurant in the two months prior to the offense. Cooks also identified Pierce as the man who robbed Johnson. Reginald Sanders, a twelve-year-old boy who observed the robbery through the front window of the restaurant as he was passing by, testified that Pierce was the man he saw committing the offense and then running from the restaurant.

The police did not recover Pierce's fingerprints from the crime scene. VI Tr. At 250. After Pierce's arrest, the police conducted a lineup with Pierce and four other men. At the time, Pierce was 18 years old. He was five feet, five inches tall, and weighed 136 pounds. The other men in the lineup were: 34 years old, five feet, six inches tall and 175 pounds; 22 years old, five feet, nine inches tall and 153 pounds; 34 years old, five feet, eight inches tall and 150 pounds; and 32 years old, five feet, ten inches tall and 170 pounds. Id. at 267-68. A Houston Police officer testified that he performed a trace metal test on Pierce's hands after his arrest to determine if he held metal shortly before his arrest. The test was positive on Pierce's left hand, and was consistent with the type of gun identified by witnesses as the murder weapon. Id. at 297-305.

Elray Mosley was the assistant manager of the Church's Fried Chicken restaurant. He testified that Pierce was in the store on several occasions before the robbery. On two occasions, Pierce

-3-

asked Johnson for free chicken.  When Johnson refused, Pierce became angry, knocked items off the counter, and threatened to hurt someone.  Id, at 330-33.

The State also entered into evidence a transcript of testimony by Orlester Jackson,[3] who died prior to Pierce's trial, from Pierce's 1977 trial.  Id. at 345-46, 357, State's Ex. 21.  Jackson testified that Pierce made a statement admitting that he killed Johnson.  State's Ex. 21 at 429.  Pierce presented evidence in support of his theory that he was mistakenly identified as the shooter.  See, e.g., VI Tr. at 529-58 (testimony about mistaken identification of Pierce in another case).  The jury found Pierce guilty of capital murder for murdering Johnson during the course of a robbery.  Id. at 855.

During the penalty phase the state presented evidence that Pierce stabbed a man during an altercation at a nightclub.  VII Tr. at 16-30.  Willie Mae Johnson testified that Pierce and an accomplice attempted to rob Johnson and her husband at the business they ran from their home.  Pierce brandished a knife and his accomplice brandished a gun.  Id. at 37-49.  An assistant principal of the middle school Pierce attended testified that Pierce had a poor reputation for being peaceful and law abiding.  Id. at 52-54. While incarcerated on death row, Pierce killed another inmate.

---

[3]    Jackson's first name is spelled several ways thoughout the proceedings.  The transcript of his prior testimony identifies him as "Orlester," and he will be so identified throughout this opinion.

VII Tr. at 71-75.  He also threatened to kill a TDCJ employee with a shank, or homemade knife.  Id. at 120.  A deputy also found a shank in Pierce's possession during a search at the Harris County Jail.  Id. at 159-61.

Sister Isabell Estrada testified that she was the principal at Holy Cross School in Bay City, Texas for 12 years.  Holy Cross is a kindergarten through sixth grade Catholic school.  She visited Pierce several times while he was in the Harris County jail and on death row.  Sister Isabell testified that in the four years she knew Pierce he changed for the better.  He became less bitter and angry, and developed intellectually so that he was better able to participate in conversation.  Pierce's attorney also asked Sister Isabell about changes she saw in children as they age, but the trial court sustained an objection to this line of questioning. Pierce's attorney made a bill of exception and established that Sister Isabell would have testified that, in her experience, troubled children can be rehabilitated with a change in circumstances.  Id. at 185-94.

Death row inmate G.W. Green testified that the man Pierce killed on death row was a "vicious sort of dude."  Green and two other death row inmates testified that they heard the other inmate threaten Pierce.  They also testified that Pierce got along well with people on death row  Id. at 195-229.

Pierce's mother, Erline Pierce, testified that Pierce is the fifth of her nine children.  She described Pierce as an average

student (though his school records, discussed below, paint a different picture) and was not a behavior problem until junior high school. When Pierce was 13 or 14 years old he began hanging around with older boys and getting into trouble. Pierce was always honest with his mother and took responsibility for his actions. She testified that Pierce grew up a lot during his time in prison, is quiet and respectful, tries to help other people, and is religious. Since being incarcerated, Pierce has sought educational opportunities. He also makes picture frames and jewelry boxes to send home to his mother. Id. at 232-41, Def. Ex. 17-19.

The jury unanimously answered "yes" to both special issues: (1) whether Pierce's conduct that caused Johnson's death was deliberate and undertaken with the reasonable expectation that the death of the victim or another would result; and (2) whether there was a probability that Pierce would commit future criminal acts of violence that would constitute a continuing threat to society. Accordingly, the trial court sentenced Pierce to death. Id. at 318-21. The TCCA affirmed Pierce's conviction and sentence, Pierce v. State, 777 S.W.2d 399 (Tex.Crim.App. 1989), cert. denied, 496 U.S. 912 (1990), and denied his application for postconviction relief, Ex Parte Pierce, No. 15,859-03 (Tex.Crim.App. Sept. 19, 2001). On August 29, 2002, Pierce filed a successor state habeas application. The TCCA denied this application on April 18, 2007. Ex Parte Pierce, No. 15,859-04 (Tex.Crim.App. Apr. 18, 2007). On May 9, 2007, Pierce filed his federal habeas petition. On August

-6-

30, 2007, he filed an amended petition.  On July 1, 2008, after conducting limited discovery, Pierce filed a supplemental petition.

## II.  <u>The Applicable Legal Standards</u>

### A.  <u>The Antiterrorism and Effective Death Penalty Act</u>

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See <u>Lindh v. Murphy</u>, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Kitchens v. Johnson</u>, 190 F.3d 698, 700 (5th Cir. 1999).  For questions of law or mixed questions of law and fact adjudicated on the merits in state court, the court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  See <u>Martin v. Cain</u>, 246 F.3d 471, 475 (5th Cir.), <u>cert. denied</u>, 534 U.S. 885 (2001).  Under the "contrary to" clause, the court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the

-7-

Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" Dowthitt v. Johnson, 230 F.3d 733, 740-41 (5th Cir. 2000), cert. denied, 532 U.S. 915 (2001) (quoting Williams v. Taylor, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." Hoover v. Johnson, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001), aff'd, 286 F.3d 230 (5th Cir. 2002) (en banc), cert. denied sub nom. Neal v. Epps, 537 U.S. 1104 (2003). The sole inquiry for a

federal court under the 'unreasonable application' prong becomes
"whether the state court's determination is 'at least minimally
consistent with the facts and circumstances of the case.'" Id.
(quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)); see
also Gardner v. Johnson, 247 F.3d 551, 560 (5th Cir. 2001) ("Even
though we cannot reverse a decision merely because we would reach
a different outcome, we must reverse when we conclude that the
state court decision applies the correct legal rule to a given set
of facts in a manner that is so patently incorrect as to be
'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues
unless the state court's adjudication of the merits was based on an
unreasonable determination of the facts in light of the evidence
presented in the state court proceeding. See 28 U.S.C.
§ 2254(d)(2); Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000),
cert. denied, 532 U.S. 1039 (2001).  The state court's factual
determinations are presumed correct unless rebutted by "clear and
convincing evidence." 28 U.S.C. § 2254(e)(1); see also Jackson v.
Anderson, 112 F.3d 823, 824-25 (5th Cir. 1997), cert. denied, 522
U.S. 1119 (1998).

**B.   The Standard for Summary Judgment in Habeas Corpus Cases**

"As a general principle, Rule 56 of the Federal Rules of Civil
Procedure, relating to summary judgment, applies with equal force
in the context of habeas corpus cases." Clark v. Johnson, 202 F.3d
760, 764 (5th Cir.), cert. denied, 531 U.S. 831 (2000).   In

-9-

ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, this court may not resolve the facts of the case in the petitioner's favor.  See Marshall v. Lonberger, 459 U.S. 422, 432 (1983); Sumner v. Mata, 449 U.S. 539, 547 (1981).

### III. **Analysis**

Pierce's Amended Petition raises 13 claims for relief, each of which is addressed below.

**A.  Penry**

In his first claim for relief, Pierce argues that the jury was unable to give full effect to his mitigating evidence.  In Lockett v. Ohio, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death."  438 U.S. at 604 (emphasis in original).  This holding is based on the plurality's conclusion

that death "is so profoundly different from all other penalties" as to render "an individualized decision . . . essential in capital cases." Id. at 605.  In Penry v. Johnson, 532 U.S. 782 (2001), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence." Id. at 797 (internal quotation marks, citation and brackets omitted).

Pierce presented evidence of his youth at the time of the crime (he was just past his eighteenth birthday), that he was a good student and was not a discipline problem as a child, that his behavior in prison was generally good, and that he matured emotionally and spiritually while in prison.  His mother testified that he was honest and respectful toward her, that he admitted his wrongs in the past, and that he sought education and developed intellectually and creatively while in prison, improving his verbal abilities and making crafts, such as picture frames and jewelry boxes.  The jurors were asked to answer two special issues: (1) whether Pierce's conduct that caused Johnson's death was deliberate and undertaken with the reasonable expectation that the death of the victim or another would result; and (2) whether there was a probability that Pierce would commit future criminal acts of violence that would constitute a continuing threat to society.  The TCCA found that the jurors could consider and give effect to Pierce's mitigating evidence.  The TCCA's conclusion was not reasonable.

-11-

On the face of the special issues, the jury could consider some of Pierce's evidence under the future dangerousness special issue. For example, Pierce's youth at the time of the offense and his behavior in prison are relevant to that issue. See Johnson v. Texas, 509 U.S. 350 (1993); Franklin v. Lynaugh, 487 U.S. 164, 177 (1988). Other evidence, however, is irrelevant, or is only partially relevant, to the future dangerousness issue, yet raises questions about Pierce's general moral culpability and character. For example, his honesty and respect toward his mother, his willingness to admit past wrongs, his efforts to improve himself through education, and his work making craft items have little relevance to future dangerousness, but are relevant as to his character.

Penry makes clear that jurors must have an opportunity to "fully consider[] the mitigating evidence as it [bears] on the broader question of [the defendant's] moral culpability." 532 U.S. at 787. The "State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'" Tennard v. Dretke, 542 U.S. 274, 285 (2004) (quoting McKoy v. North Carolina, 494 U.S. 433, 440 (1990)). The Eighth Amendment requires that a capital sentencing jury be able to consider and give effect to *any* mitigating evidence that meets this low threshold of relevance. Tennard, 542 U.S. at 285. Some of Pierce's evidence was outside the scope of the two special issues,

and the jury had no means by which to consider and give effect to this evidence.

The Penry violation was exacerbated by prosecution comments during closing argument.  During closing argument, the prosecutor told the jury:

> You each promised me individually that if the State brought you evidence that convinced you beyond a reasonable doubt that the answers to these special issues would be yes and you knew that a "yes" answer to each one of these issues would mean the death penalty that you would answer those questions "yes" and that you would never change your answer despite the evidence in this case just so that the death penalty would not be imposed.

VII Tr. at 298.  This argument suggests to the jury that it could not consider Pierce's mitigating evidence at all (telling jurors that they promised "that you would never change your answer despite the evidence in this case just so that the death penalty would not be imposed"), but could consider only whether the State presented sufficient evidence to merit a "yes" answer to the special issues: The prosecutor clearly stated that the jury must answer "yes" "if the State brought you evidence that convinced you beyond a reasonable doubt that the answers to these special issues would be yes."

The Penry line of cases teaches that the two special issues submitted to Pierce's jury do not pass constitutional muster because they provide no mechanism for the jury to consider and give effect

-13-

to mitigating evidence weighing on a defendant's moral culpability.

> [S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

Abdul-Kabir v. Quarterman, 550 U.S. 233, ___, 127 S.Ct. 1654, 1664 (2007). The special issues in this case, especially when considered in light of the State's closing argument, violated Pierce's rights under Penry. See Brewer v. Quarterman, 550 U.S. 286, 127 S.Ct. 1706, 1712 (finding Penry error based on "a reasonable likelihood" that jurors followed prosecutor's statement that the jury could only answer the special issues and not exercise independent moral judgment). Accordingly, Pierce is entitled to relief on his Penry claim.

**B.    Exclusion Of Mitigating Evidence**

In his second claim for relief Pierce contends that the trial court's limitations on Sister Isabell Estrada's testimony violated his right to present mitigating evidence. Sister Isabell testified that she visited Pierce and saw a positive change in Pierce over time. The trial court found that her proposed testimony about her experience in observing troubled youths change as their circumstances changed was irrelevant.

The state habeas court rejected this claim, noting that

-14-

> the evidence presented in the defense's offer
> of proof of Sister Estrada did not concern any
> characteristics peculiar to the applicant; that
> Estrada's testimony consisted of generalities
> regarding children and how their upbringing
> affected their behavior; and, that such
> testimony was not particularized to illustrate
> that someone like [Pierce] would not pose a
> continuing danger to society.

SH1. at 459.[4]  Therefore, the court concluded that her proposed testimony was not relevant, material, or probative.  Id. at 497.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973).  In the context of a capital sentencing hearing, the right to present a defense extends to evidence relevant to the defendant's character or record.  Lockett v. Ohio, 438 U.S. 586, 604 (1978).  While acknowledging the general right of a defendant to present evidence, however, Chambers noted that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  410 U.S. at 302.

Sister Isabell testified about her personal knowledge of Pierce.  The court only excluded her proposed testimony concerning her general observations about children from troubled backgrounds.  This proposed testimony did not concern Pierce in particular.  The

------

[4]    "SH1" refers to the transcript of Pierce's original state habeas corpus proceeding.  "SH2" refers to the transcript of the proceedings on Pierce's successor state habeas application.

proposed testimony was based on Sister Isabell's observations as a school principal, not on any scientific research or peer-reviewed publication.  The relevance of this testimony to Pierce was marginal at best.  In light of the fact that the excluded testimony did not relate personally to Pierce and was only tangentially relevant to the issues before the jury, the state courts were not unreasonable in their conclusions that this evidence was irrelevant.

## C.   Mental Retardation

In his third claim for relief Pierce contends that the Eighth Amendment bars his execution because he is mentally retarded.  The American Association on Mental Retardation ("AAMR") defines mental retardation as (1) sub-average general intellectual functioning; (2) related limitations in two or more of the following adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset before the age of 18. R. Luckasson, et al., <u>Mental Retardation: Definition, Classification, and Systems of Supports</u> (9th ed. 1992).  While the Supreme Court, in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), held that a state may not execute a mentally retarded offender, the court did not adopt a particular definition of mental retardation.  Moreover, the Fifth Circuit has noted that <u>Atkins</u> does not mandate that a state adopt any particular clinical definition.

> Although the [<u>Atkins</u>] Court did refer to the clinical definitions of mental retardation promulgated by the AAMR and the American

> Psychiatric Association ("APA"), it did not
> dictate that the approach and analysis of the
> State *must* track the AAMR or the APA exactly.

Clark v. Quarterman, 457 F.3d 441, 445 (5th Cir. 2006), cert.
denied, 127 S.Ct. 1373 (2007).

The Texas legislature has yet to adopt a definition of mental
retardation for Atkins purposes.  The TCCA has opted for a blend of
the AAMR and APA standards and the standards of Texas's Persons With
Mental Retardation Act, TEX. HEALTH & SAFETY CODE ANN., § 591.003(13).
See Ex parte Briseno, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  These
standards are in substantial agreement that a diagnosis of mental
retardation requires:  (1) significantly sub-average intellectual
functioning; (2) deficits in adaptive functioning; and (3) onset
before age 18.[5]

The state habeas court considered affidavits and expert reports
on Pierce's Atkins claim.  It concluded that Pierce does not have
significantly sub-average intellectual functioning or deficits in
adaptive functioning.

1.   Significantly Sub-average Intellectual Functioning

The AAMR defines significantly sub-average intellectual
functioning as "an IQ of about 70 or below (approximately 2 standard
deviations below the mean)."  Briseno, 135 S.W.3d at 7 n.24.

Dr. June Kaufman, a Ph.D. in clinical psychology, evaluated
Pierce apparently in connection with his original state habeas

---

[5]The Supreme Court cited this definition with approval in
Atkins, 536 U.S. at 309 n.3.

application in 1990.  Dr. Kaufman stated that she reviewed Pierce's records from the Texas Youth Commission, a social summary prepared by TDCJ, a mental status report by Dr. Jerome Brown of the Forensic Psychiatry Unit of the Harris County Psychiatric Hospital prepared in 1977, and a 1977 mental status evaluation by John D. Nottingham, M.D. of the Forensic Psychiatry Unit of the Harris County Psychiatric Hospital.  Dr. Kaufman also received background information about Pierce.

On September 7, 1990, Dr. Kaufman visited Pierce on death row and conducted an evaluation that included collecting data and administering a variety of psychometric instruments.  Dr. Kaufman described Pierce as "extremely cooperative" and "highly motivated to do as well as possible on the tests."  Dr. Kaufman noted that Pierce showed great concentration of the Wechsler Adult Intelligence Scale-Revised ("WAIS-R").  She received very consistent results on a wide range of tests.  These results, along with her observations of Pierce's attitude and effort led her to conclude that the results are "without question valid."

Dr. Kaufman determined from background reports that Pierce was the fifth of nine children born to a poor family.  Pierce's father earned as little as $5,000 per year.  Pierce's mother smoked during her pregnancy, and Pierce's father was an alcoholic.  Pierce had a heart problem and suffered severe headaches as a child.  He was regarded as "slow" and "sickly."  Pierce was also a "free bleeder," i.e., it took him a long time to stop bleeding after cutting

himself.  Due to his physical infirmities, Pierce was often absent from school, and often had to leave school early.  Dr. Kaufman stated that this, coupled with low intelligence, caused Pierce to do poorly in school.  She noted that Pierce failed first and third grade and was reported to be very "slow" in his schoolwork.  He was also described as stubborn which, Dr. Kaufman noted, "might reflect his youthful inability to confront his inability to achieve in school."

Dr. Kaufman observed that Pierce's home life was difficult. His father was a violent alcoholic who beat Pierce, sometimes striking Pierce's head against the wall, because he considered Pierce "no good" since he was so slow.  As Pierce grew older, he tried to work with his father, who was a carpenter, but Pierce's father was very critical of Pierce's limited abilities.

In 1972 and 1974, Pierce was referred to the probation department for incidents at school.  He was administered the Otis Lennon Mental Abilities Exam and achieved a full scale IQ of 74.

A 1975 report from the Texas Youth Commission reports Pierce's full scale IQ of 67.  The examiner specifically stated that Pierce fell within the mentally retarded range.  The examiner reported that Pierce was very cooperative in the testing procedure.  Pierce blamed his limited social and educational abilities on his environment. Dr. Kaufman described this as

> a rather classic example of what is sometimes
> called the phenomenon of "passing and denial."
> Contrary to some popular beliefs, mildly

> retarded persons, or those with significant
> deficits in intellectual functioning, are very
> often aware of their own deficiencies. This
> creates an enormous sense of personal
> inadequacy. The individual will therefore go
> to great lengths to try to disguise their
> perceived inadequacies from others.

The 1975 report also noted that Pierce tended to think concretely and did not generalize cognitively from one experience to the next, and noted Pierce's extremely poor verbal skills. Dr. Kaufman explained that "[c]oncrete – as opposed to abstract – thinking is a classic trait of those of significantly sub-normal intelligence."

Respondent argues that in 1977 Dr. Jerome Brown concluded that Pierce's IQ was in the "borderline range," noting an Ammons IQ of 75, but that Pierce "should not be considered mentally defective or severely retarded." In her report Dr. Kaufman observed that Dr. Brown did not define "severely retarded." Dr. Kaufman stated that the American Psychiatric Association defines severe mental retardation as an IQ between 20 and 40. People with an IQ that low constitute less than four percent of the population of mentally retarded people which, as a whole, comprises only about one percent of the general population. "Severe" retardation, of course, is not what Atkins requires. Dr. Kaufman also stated that the Ammons IQ test is not generally regarded as reliable and that it is not improbable that Pierce would score higher on the Ammons than he did on the administration of the WAIS a few months earlier. She opined that "certainly up to 1977, Anthony Pierce was functionally mentally retarded." SH2. at 17-41.

The State submitted test results from an administration of the WAIS in 1976. Pierce scored a full scale IQ of 81. Id. at 216-17.

Dr. Richard Garnett submitted an affidavit in support of Pierce's state habeas petition. Dr. Garnett noted that Pierce failed the first and third grades. His academic progress never developed beyond the second or third grade level, and he began failing most of his classes in fifth and sixth grades. Dr. Garnett also noted that the IQ score of 81 was an outlier. Pierce scored 67 on the WISC one year earlier. Dr. Garnett also noted that Pierce achieved seven scores below 75 over a period of years before scoring 81 in 1975. Dr. Garnett noted the test-retest factor, wherein exposure to the same or a related test can influence test performance, or to possible hints, examiner direction, or learning that could raise subsequent scores. Id. at 280-88.

Dr. Susana A. Rosin, a Ph.D. in clinical psychology, reviewed records sent to her by Pierce's state habeas counsel. She observed that Pierce's school records showed a consistent pattern of underachievement. He obtained full scale IQ scores of 69 and 74 at ages nine and twelve, repeated first and third grades, and obtained very low scores on standardized academic achievement tests. Two IQ tests administered in 1975 yielded scores of 67 and 75. Two of Pierce's lowest scores were obtained on the Wechsler scales (the WISC and the WAIS). Dr. Rosin described these tests as "the gold standard for intelligence testing," and stated that Wechsler scores are typically considered more reliable and valid than scores from

other instruments.  Dr. Rosin administered the WAIS-III, and Pierce
obtained a full scale IQ of 70.  Dr. Rosin described this as falling
in the mildly mentally retarded range.  He had the most difficulty
with those portions of the test involving numerical reasoning,
general fund of knowledge, new learning, attention, visual attention
to detail, overall perceptual organization and verbal/non-verbal
reasoning.  Pierce's results on the Wide Range Achievement Test were
consistent with his scores on the WAIS-III.  Id. at 308-12.

Dr. George Denkowski submitted an affidavit for the State.
Dr. Denkowski reviewed documents and examined Pierce at the Harris
County Jail.  He found that Pierce responded to questions directly
and rationally.  Pierce recalled that his attorney told him that
Dr. Denkowski would visit, but did not recall the purpose of the
visit.  After reviewing the court order, Pierce said "yes, you're
here to evaluate me."  Dr. Denkowski asked Pierce if he knew what
the term mental retardation means, and Pierce responded that "you've
got various degrees of it," and that it pertains to "not
comprehending certain things, not functioning in certain
environments."  Pierce also stated that he understood that no
confidentiality applied to his meeting with Dr. Denkowski, that
Dr. Denkowski would testify at his hearing, and that the testimony
might hurt or help Pierce's case.

Over two days, Dr. Denkowski administered: Test of Memory
Malingering ("TOMM"); Stanford-Binet Intelligence Scales-Fifth
Edition ("SB-5"); Wide Range Achievement Test-Third Edition ("WRAT-

-22-

3"); Dot Counting Test; Rey 15-Item Memory Test; Beck Anxiety Inventory ("BAI"); Beck Depression Inventory-Second Edition ("BDI-2"); and Adaptive Behavior Assessment System ("ABAS"). Dr. Denkowski concluded that Pierce's full-scale IQ is 80 and his mental ability is of 80 to 84 quality. Dr. Denkowski stated that this is consistent with Dr. Kaufman's unstated, but implicit, finding of an IQ in the 75 to 84 range,[6] and that Rosin understated Pierce's IQ due to methodological flaws.

Dr. Denkowski noted Pierce's IQ scores of 69 and 74 at ages 9 and 12 on the Otis-Lennon Test of Mental Ability. He stated, however, that the Otis-Lennon is not a test of general intelligence, but actually measures "verbal-educational" aptitude for school achievement. This is why, Dr. Denkowski explained, the name of the test was changed to the Otis-Lennon School Ability Test in 1978. He also cited professional literature for the proposition that the Otis-Lennon is known to understate the academic ability of children who do not have normal backgrounds and motivation.

Dr. Denkowski also noted Pierce's score of 67 on an administration of the WISC at age 15. He observed, however, that Pierce was administered a short form of the test, which reduces the reliability of the score. He cited professional literature for the proposition that the short form WISC has a standard error of

---

[6]     SH2. at 375-376.

measurement of 9 points, meaning that the 95% confidence interval for Pierce's score is between 49 and 85.

Dr. Denkowski also addressed Pierce's score of 81 on an abbreviated form of the WAIS, administered at age 16 by the Texas Youth Council. Again, because this was a short form test, the standard error of measurement was increased. The 95% confidence interval on this score is 74-88.

Dr. Denkowski dismissed Pierce's poor academic performance as the result of his chaotic and dysfunctional home life. He opined that Pierce's scores on the Iowa Test of Basic Skills in combination with his grades indicated adequate learning capacity. Dr. Denkowski similarly dismissed Pierce's poor progress in fourth and fifth grades as a result of minor criminal activity, truancy, running away from home, alcohol use and smoking. From these activities, Dr. Denkowski concluded that "habitual offending had become more important to Mr. Pierce than schoolwork." He attributed Pierce's poor progress to lack of motivation.

Dr. Denkowski opined that screening after Pierce turned 18 was uninformative. Pierce took the Ammons Quick Test after his arrest and scored a 75. Dr. Denkowski noted that this test is antiquated and very short. He also observed that Dr. Kaufman described Pierce as "in the borderline range of intellectual functioning," but did not give a specific IQ score. The DSM-III-R, which was the diagnostic authority at the time of Dr. Kaufman's report, stated that borderline intellectual functioning meant a score in the 71 to

84 range.  Dr. Denkowski dismissed Dr. Rosin's score of 70 on the WAIS-III because Dr. Rosin did not examine Pierce for depression or anxiety and did not conduct a formal assessment of his effort. Dr. Rosin did not give the three learning/training trails for the WAIS-III Matrix Reasoning task, and did not demonstrate how to execute the Digit Symbol-Coding task.  Dr. Denkowski stated that he could not determine from Dr. Rosin's report whether any other portions of the test were improperly administered, but concluded that it is likely that they were based on Dr. Rosin's improper administration of these specifically identified portions.

On Dr. Denkowski's administration of the SB-5, Pierce attained a Verbal IQ of 83, a Nonverbal IQ of 79, and a Full Scale IQ of 80. Dr. Denkowski opined that Pierce put in good effort, but suffered from moderate anxiety and mild depression which likely suppressed his scores somewhat.   Dr. Denkowski therefore concluded that Pierce's score of 80 actually somewhat understates his true IQ, which Dr. Denkowski concluded was in the 80 to 84 range.

Dr. Denkowski also opined that the results of the WRAT-3 administered by Dr. Rosin undercut Pierce's claim of mental retardation.   According to those results, Pierce's mechanical reading and spelling skills are at the ninth grade level. Dr. Denkowski stated that this is well above the proficiency demonstrated by the average TDCJ inmate (Dr. Denkowski places this average at the mid-seventh grade level).   Pierce's mathematical skills were only at the fourth to fifth grade level.   Pierce's

scores on Dr. Denkowski's administration of the WRAT-3 were consistent with his earlier scores.  SH2. at 361-87.

        a.   State Court Findings

The court credited Dr. Denkowski's affidavit, finding that Pierce's IQ is likely in the 80 to 84 range.  SH2. at 338 ¶ 34.  The court also accepted Dr. Denkowski's conclusion that the Otis-Lennon and WISC test scores were not reliable indicators of Pierce's IQ.  Id. at ¶¶ 36-39.  The court found that the WAIS administered in 1976 showed an IQ with a 95% confidence interval of 74-88.  Id. at ¶ 41.  The court also noted a psychiatric examination in 1976 in which the psychiatrist concluded that Pierce had low average to average intelligence, and that, despite repeating first and third grades, Pierce was not labeled mentally retarded or placed in special education.  Id. at ¶¶ 42-43.

The court also observed that Pierce's junior high school assistant principal testified during the penalty phase of his trial that he counseled Pierce for approximately four years and always considered him a normal child.  He attributed Pierce's poor school performance to poor attendance.  Id. at ¶ 47.

The court accepted Dr. Denkowski's conclusions that Pierce's poor academic performance were attributable to his chaotic and dysfunctional home life, lack of parental support for education, poor school attendance, poor conduct, Pierce's lack of respect for authority, and his adoption of a delinquent lifestyle that involved

drug abuse.  His poor academic performance was not attributable to significantly subaverage intellectual ability.  Id. at ¶¶ 49-50.

The court rejected Dr. Kaufman's conclusion that Pierce is "functionally mentally retarded" because Dr. Kaufman's report does not record the results of the WAIS-R she administered to Pierce. The court also credited Dr. Denkowski's statement that Dr. Kaufman's description of Pierce's WAIS-R full scale IQ score as "borderline intellectual functioning" translates to an IQ in the 75 to 84 range. SH2. at 343-44, ¶¶ 55-58.

The court found that Dr. Garnett's conclusion that Pierce is mentally retarded was based solely on Dr. Garnett's review of documents, and not on any evaluation or testing of Pierce.  The court further found that Dr. Garnett is not licensed as a psychologist in Texas, is not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis, and that Dr. Garnett is, instead, a licensed marriage and family counselor. The court concluded that Dr. Garnett is not qualified to make a diagnosis of mental retardation under Texas law.  The court also observed that other courts have found Dr. Garnett to be a biased witness and to have inadequate experience dealing with criminal defendants, leading to unwarranted conclusions of mental retardation.  The court rejected Dr. Garnett's conclusion.  SH2. at 344-45 ¶¶ 59-67.[7]

---

[7]    The TCCA did not adopt ¶ 62 dealing with Dr. Garnett's
(continued...)

-27-

The state habeas court rejected Dr. Rosin's conclusion that Pierce has significantly subaverage intellectual functioning because Dr. Rosin failed to assess Pierce for depression or anxiety or conduct a formal assessment of Pierce's effort.  Dr. Rosin also did not administer the tests as intended by their publishers.  Based on Pierce's consistent results on the WRAT-3 tests administered by Drs. Rosin and Denkowski, the court concluded that Pierce has adequate learning capability, and that his academic achievement and mental ability indicated that his WAIS-III full scale IQ score of 70 was inaccurate.  SH2. at 346-47, ¶¶ 68-73.  Based on these findings, the court concluded that Pierce does not have significantly subaverage intellectual functioning.  SH2. at 347, ¶ 74.

> b.   Analysis

As noted above, under the AEDPA this court must defer to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  Pierce argues that they were.  Pierce's argument largely reiterates the evidence discussed by both this Court and the state habeas court.  He also argues that Dr. Denkowski is not credible.

Citing an unpublished state habeas case, Ex Parte Plata, No. AP-75,820 (Tex.Crim.App. Jan. 16, 2008), Pierce notes that the state

---

[7](...continued)
qualifications.

trial court and the TCCA found that Dr. Denkowski improperly inflated an IQ score based on claims of his own clinical judgment. Pierce argues that Dr. Denkowski did the same thing in this case, and that he denigrates Dr. Rosin's conclusions "because she did not engage in the sort of speculation that the Plata court found scientifically unsound in that she did not account for depression and anxiety." Response To Summary Judgment Motion at 58.

While the Plata court criticized Dr. Denkowski for, among other things, increasing his estimate of an earlier IQ score based on unsubstantiated assumptions about anxiety, this case is clearly distinguishable. In this case, Dr. Denkowski tested Pierce for anxiety and depression and found that he suffered from moderate degrees of both. Dr. Denkowski explained how these could impair performance on an IQ test. Completely apart from his discussion of anxiety, however, Dr. Denkowski pointed to specific methodological flaws in Dr. Rosin's administration of tests. These flaws, including her failure to administer certain portions of the tests and her failure to demonstrate how to perform a task, are reasonable bases for concluding that Dr. Rosin's test results understate Pierce's true IQ.

Moreover, unlike in Plata, Dr. Denkowski did not have to rely on claims of clinical judgment to achieve an IQ score for Pierce that is above the mentally retarded range; Pierce attained a full scale IQ of 80 on Dr. Denkowski's administration of the SB-5. Dr. Denkowski's conclusion that Pierce's actual IQ is slightly

higher than that is based on his determinations that Pierce suffers from anxiety and depression.  Unlike <u>Plata</u>, this conclusion is not based on completely unsubstantiated "clinical judgment."  Moreover, even if Dr. Denkowski's slight upward adjustment was disregarded, that would still leave Pierce with a score of 80 on the SB-5.

Although the record reflects that Pierce has below average intelligence, the state habeas court was not unreasonable in accepting Dr. Denkowski's criticisms of earlier IQ scores as methodologically flawed or otherwise unreliable and crediting Pierce's score of 80 on the SB-5.  Therefore, the state habeas court was not unreasonable in concluding that Pierce does not have significantly subaverage intellectual functioning.

     2.   <u>Deficits In Adaptive Functioning</u>

The second prong of a mental retardation claim requires proof of deficits in adaptive behavior related to significantly sub-average intelligence.  The state habeas court noted that the 1992 AAMR diagnostic manual and the DSM-IV identify 10 adaptive behavior skill areas: work, leisure, health and safety, self-care, home living, community use, social, functional academics, and communication.  SH2. at 247, ¶ 76.

Dr. Kaufman opined that Pierce does not think through the consequences of his actions and that he has "a gross deficiency in understand[ing] society's basic value systems and conventions" resulting in "extremely poor social judgment in everyday life situations."  SH2. at 27, ¶¶ 35-36.  She seems to base this opinion

-30-

on Pierce's delinquent and criminal conduct.  See SH2. at 23-25, ¶¶
23-24, 27, 29-30.

Dr. Denkowski opined that, aside from his modest academic
skills, Pierce did not manifest deficits in adaptive behavior.  SH2.
at 364.  He cited professional literature stating that maladaptive
behavior does not meet the criterion of significant limitations in
adaptive functioning, rejecting Drs. Kaufman's and Garnett's
contentions that Pierce's criminality helps to satisfy this prong.
He also rejected their conclusions that Pierce's academic
performance demonstrates deficits in adaptive behavior because "even
pronounced academic limitations do not discriminate many normal from
mentally retarded criminal offenders.  For instance, the average
educational achievement of Texas prison inmates is only mid-7th
grade."  SH2. at 373.

Dr. Garnett acknowledged that Pierce has responded well in
structured settings.  He noted that it is common for mentally
retarded people "in special programs or confinement to receive
praise and high marks for their behavior while there, only to behave
again in unacceptable and/or illegal ways immediately after that
praise or upon release."  SH2. at 285.

Dr. Rosin concluded that Pierce has significant deficits in
conceptual, social, and practical skills.  She cited a long history
of problems in getting along with others and exercising sound
judgment.  She also cited evidence that Pierce had trouble following
rules, had fallen prey to social and peer pressure, and had shown

-31-

difficulty learning from his experiences.  She stated that these
impressions are substantiated by Pierce's juvenile probation
records.  Dr. Rosin completed the Vineland Adaptive Behavior Scales
with information from Pierce's records, reports from the Assistant
Warden on death row, and information provided by Pierce.  The only
specific area in which Dr. Rosin noted a significant deficit based
on the Vineland was Communication.  She noted that Pierce scored in
the "adequate" range on Daily Living and Socialization, but
dismissed these results as "yet another example of how a mildly
mentally retarded individual can eventually adapt to the rules of
a highly structured environment."  SH2. at 311-12.

Dr. Denkowski noted that a staff evaluation from the Texas
Youth Council described Pierce as able to "dress correctly without
supervision," "take care of personal articles," "care about personal
appearance," "participate in most activities," being "active in
sports," and "a leader," and "having good manners." Id. at 373-74.
During Dr. Denkowski's examination, Pierce reported performing
regular chores around his mother's house as a child, working at
various jobs, buying his own clothes since age 12, interacting with
girls, playing football, baseball, and basketball, running drugs for
dealers, and socializing with friends.  Id. at 374.  Dr. Garnett
stated that the ability to perform menial jobs is not uncommon in
mentally retarded individuals.  Id. at 285.

Dr. Denkowski also criticized Dr. Rosin's use of the Vineland
as improper, noting that "unless the adaptive behavior rating is

-32-

made directly by the examinee, it <u>must</u> be provided by someone who has observed the examinee's behavior sufficiently in settings that permit display of the skills being assessed." <u>Id.</u> at 379.  He also criticized Dr. Rosin for rating Pierce on his behavior during his incarceration.  Prison, Dr. Denkowski explained, "preclude[s] display of many and perhaps most behaviors gauged by contemporary adaptive behavior instruments." <u>Id.</u> at 380.

Dr. Denkowski evaluated Pierce using the ABAS.  He stated that "[t]he ABAS is the only instrument that specifically addresses the ten AAMR skill areas, and it is the sole measure that has been recommended for use with prison inmates." <u>Id.</u>  In the ABAS, the examinee scores himself on a scale of 0 to 3 for each of 239 basic skills.  A score of 3 is assigned if the skill is always or almost always performed when it should be, a score of 2 is assigned if the skill is only sometimes performed, a 1 is given if it is rarely or never performed, and a 0 is given if it cannot be performed.  Based on these scores, a total raw score is given for each skill area, which is converted to a scaled score using tables in the test administration manual, and the sum of the 10 scaled scores is used to compute a composite score.  A valid composite score of 70 or less can signify deficits.  Impaired scores in two of the 10 skill areas can also convey deficits.  Each area receives a scaled score of 1 to 13.  Normal functioning is shown by a score of 8 to 12, and significant limitations by a score of 4 or less. <u>Id.</u> at 381.

-33-

Pierce received a total composite score of 70. This included a very low score of 2 in functional academics, leading Dr. Denkowski to opine that the score in functional academics skewed the composite score. Because Pierce was significantly impaired only in the area of functional academics, Dr. Denkowski concluded that he did not have significant deficits in adaptive behavior. Id. at 381.

The state habeas court credited Dr. Denkowski's conclusions and found that Pierce does not suffer from significant deficits in adaptive behavior. The court specifically noted that Pierce has held numerous jobs, some of which were semi-skilled, and did not recall being laid off or fired, and demonstrated general ability to function in daily life. Id. at 349-55.

Pierce cites language in Plata criticizing Dr. Denkowski's use of the ABAS as improper. Even if Dr. Denkowski's use of the ABAS was not considered, however, the evidence supports a finding that Pierce does not have significant deficits in adaptive behavior. Most of the conduct Pierce points to is criminal or delinquent behavior which, as Dr. Denkowski points out with support from relevant professional literature, is not a basis for finding a significant deficit in this area. This, along with his criticism of Dr. Rosin's methodology, adequately supports the state court's conclusion. Accordingly, the state habeas court's conclusion was reasonable.

3.   Onset Before Age 18

The state habeas court found that, because Pierce failed to show that he has significantly subaverage intelligence or deficits in adaptive behavior, he failed to show onset before age 18.  SH2. at 355, ¶ 98.  This conclusion is reasonable.  Accordingly, Pierce has not shown that he is mentally retarded.

**D.   Ineffective Assistance Of Counsel**

In his fourth claim for relief, Pierce contends that his trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence of mental retardation, childhood abuse, and impoverished upbringing.   To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the Strickland test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.   Id. at 687-88.   Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.   Id. at 688.   Review of counsel's performance is deferential.   Id. at 689.

-35-

Assuming that counsel rendered deficient performance, Pierce cannot show prejudice.  The evidence Pierce claims went undeveloped and unpresented – evidence of his low intelligence,[8] his poor health as a child, the physical abuse he suffered at the hands of his father, the extreme poverty in which he grew up, and other evidence of a similar nature – is all general mitigation evidence, i.e., evidence that might have elicited sympathy or reduced his general moral culpability, but not evidence directly relevant to the special issues presented to the jury.  As discussed above in connection with Pierce's Penry claim, the special issues provided the jury with no mechanism to consider or give effect to such general mitigation evidence.

In assessing prejudice on a claim of ineffective assistance of counsel relating to a capital sentencing proceeding, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Strickland, 466 U.S. at 695.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

In this case, because the special issues provided no mechanism for the jury to give effect to such mitigating evidence, it cannot

---

[8]     Pierce refers to this as evidence of mental retardation. As stated in the discussion of Pierce's Atkins claim above, however, Pierce fails to demonstrate that he is mentally retarded.

be said that there is a reasonable probability that such evidence would have changed the outcome.   Therefore, Pierce cannot demonstrate <u>Strickland</u> prejudice.

This seeming Catch-22 does not leave Pierce without a remedy, however.   As discussed above, the sentencing scheme itself was unconstitutional under <u>Penry</u>.   Therefore, Pierce is entitled to a writ of habeas corpus as to his death sentence – the same relief he seeks in this <u>Strickland</u> claim – on <u>Penry</u> grounds.

**E.   Exclusion Of Evidence Relating To Identification**

Pierce attempted to present a misidentification defense.   He sought to present evidence that he was misidentified in another case, and evidence that the witness identifications in this case were unreliable.   The trial judge excluded most of this evidence. Pierce now contends that this ruling denied his rights to due process of law and compulsory process.

1.   <u>Procedural Default</u>

Quarterman argues that Pierce only presented this claim to the state courts as a state-law issue.   Therefore, Quarterman contends, this federal claim is unexhausted and procedurally defaulted. Quarterman is mistaken.

While Pierce's brief on direct appeal only presented this evidentiary claim under state law, his first state habeas application clearly cited federal constitutional law in support of the claim.   <u>See</u> Application For Writ Of Habeas Corpus at 100-101

(citing <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 867 (1982) and <u>Taylor v. Illinois</u>, 484 U.S. 400, 408 (1988), in support of this claim).[9]  Accordingly, with one exception discussed below, Pierce did present this federal constitutional claim to the state courts, and the claim is properly exhausted.

The state habeas court did not address the federal claim, instead declining to address the claim on the grounds that the TCCA rejected it on direct appeal.  As noted above, however, the decision on direct appeal addressed this claim only under state evidence law, not under federal constitutional law.  There is therefore no state court adjudication to which this court must defer.

2.   <u>Due Process/Compulsory Process</u>

In <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858 (1982), the Supreme Court held that the Sixth Amendment protects a defendant's right to call witnesses who possess evidence that is relevant, material, and vital to the defense.  Materiality means that the evidence "might have affected the outcome of the trial." <u>Id.</u> at 868 (citing <u>United States v. Agurs</u>, 427 U.S. 97, 104 (1976)).

a.   <u>Ken Austin</u>

Pierce called Ken Austin, an architect, to testify on how the dimensions of the human body can affect perception.  Austin sought to present an illustration of the lineup based on descriptions of

---

[9]    1 SR. at 102-103.

the people in the lineup.  Austin also sought to testify that the lineups were unduly suggestive and led to misidentifications.

Once Austin began testifying, the trial court ordered the jury out and demanded a proffer.  Austin explained that he utilized standard tables demonstrating comparative body sizes and shapes based on height and weight to accurately draw figures to scale.  VI Tr. at 565-74.  He also explained that counsel asked him to illustrate that differences in size and perception influence identification.  Counsel tendered three exhibits prepared by Austin to visually demonstrate this principle.  Id. at 587.  The first purported to illustrate how perceptions of size are affected by what surrounds the item being viewed.  Id. at 588, Def. Exh. 17.  The next exhibit purported to demonstrate that a witness's perceptions of an individual are affected by that individual's surroundings. Id. at 588-89, Def. Exh. 18.  Austin testified that a witness's perception of a person's size changes as the surrounding environment changes.  Id. at 589-90.  Finally, Austin attempted to recreate the lineup in which the witnesses identified Pierce as the shooter.  Id. at 591, Def. Exh. 19.  Austin testified that he drew the lineup to scale based on the Houston Police Department lineup sheet.  Austin explained that Pierce was the smallest person in the lineup, and that the differences between Pierce and the others in the lineup were greater in real life than in Austin's reduced-size drawing to scale.  Id. at 592-96.  The trial court invited an objection, and

-39-

the State complied.  Id. at 599.  The court then excluded the evidence as irrelevant.  Id. at 611.

On direct appeal, the TCCA ruled that Austin's illustration of the lineup was inadmissible because Austin could not prove that it was an accurate representation of the lineup.  The court based this conclusion on Austin's admission that he based his drawing on hearsay police reports and did not know if his drawing was an accurate depiction of the lineup.  As to Austin's proposed testimony and exhibits purporting to show that an object appears smaller when placed next to a larger object, the TCCA found that Austin offered no specialized knowledge that was not already possessed by the jurors.  Pierce v. State, 777 S.W.2d 399, 413-14 (Tex.Crim.App. 1989).

"The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  Taylor v. Illinois, 484 U.S. 400, 410 (1988).  Because Austin's depiction of the lineup was not competent evidence, and the TCCA reasonably found that his proposed expert testimony offered the jury no helpful specialized knowledge, the trial court's ruling excluding this evidence did not violate Pierce's rights to due process or compulsory process.

b.   <u>Past Misidentification</u>

Pierce also sought to present an indictment from another case in which he was misidentified.  VI Tr. at 467.  The prosecution objected and the trial court excluded the indictment as irrelevant. <u>Id.</u> at 468-71.  However, the trial court allowed the victim of the prior robbery, Raymond Steinruck, to testify.  The TCCA observed that Pierce wanted to introduce the indictment to show that the State gave Steinruck's mistaken identification enough credence to bring charges.  The TCCA rejected Pierce's claim of error, noting that the State established that Steinruck had no knowledge of the Johnson murder, and that he had less opportunity to observe the man who robbed him than did the witnesses in this case.   <u>Pierce</u>, 777 S.W.2d at 416.

It is not clear how the indictment is relevant.  At best, it shows that witnesses sometimes make mistakes, and did so in the Steinruck robbery.  The fact that defendants are sometimes the victims of mistaken identity is not controversial.  The fact that Pierce was misidentified once before does not make it any more likely that he was misidentified in this case.  As the State established, the circumstances of this case, including the amount of time the witnesses had to observe Pierce, the fact that three of the witnesses had some prior knowledge of Pierce, and the identification of Pierce's shirt, made the possibility of misidentification in this case far less likely.  The Texas courts were not unreasonable in finding this evidence irrelevant.

-41-

c.   <u>Videotape</u>

Pierce also sought to prove misidentification by introducing a videotape to demonstrate the distance and travel time between the location of the Steinruck robbery and the Church's Fried Chicken restaurant where Fred Johnson was shot.  Pierce wished to establish that the two locations were close together which, he argues, is relevant to proving that the person who committed the other robbery also shot Johnson.  VI Tr. at 486-500.  The trial court excluded this evidence as irrelevant, but admitted portions of the tape depicting the crime scene.  <u>Id.</u> at 500.

Defense counsel stated that the two locations were about four miles apart.  <u>Id.</u> at 488.  The TCCA observed that the two crimes took place about a month apart.  <u>Pierce</u>, 777 S.W.2d at 417.  Because of the time lapse and the lack of any evidence that the perpetrator went directly from one crime scene to the other, the TCCA found evidence concerning the time needed to travel from one site to the other irrelevant.  <u>Id.</u>

For the reasons stated by the TCCA, the videotape was irrelevant.  The amount of time needed to travel between the two sites has no bearing on whether Pierce or someone who committed an unrelated robbery one month earlier and four miles away committed the Johnson murder.  Irrelevant evidence is necessarily immaterial.  Therefore, its exclusion did not impact Pierce's constitutional rights.

d.   <u>Dr. Ira H. Bernstein</u>

Finally, Pierce sought to introduce testimony by Dr. Ira H. Bernstein, a professor of psychology at the University of Texas-Arlington, that eyewitness testimony is subject to error. Pierce concedes that he never argued to the state courts that the exclusion of Dr. Bernstein's testimony violated his constitutional rights. Therefore, this portion of the claim is unexhausted.

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds. "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." Orman v. Cain, 228 F.3d 616, 619-20 (5th Cir. 2000); see 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has

exhausted the remedies available in the courts of the State . . . .").  Because Petitioner did not present this claim to the Texas state courts, he has failed to properly exhaust the claim, and this Court may not consider it.  Knox v. Butler, 884 F.2d 842, 852 n.7 (5th Cir. 1989).

Pierce now argues that the evidence concerning Dr. Bernstein does not raise a new claim, but merely supplements the claim he presented to the state courts.  This court may consider evidence presented for the first time in federal habeas proceedings if that new evidence merely supplements, as opposed to fundamentally altering, claims presented to the state court.  Morris v. Dretke, 413 F.3d 484, 491 (5th Cir. 2005).  If the petitioner presents material evidentiary support for the first time in federal court, then he has not exhausted his state remedies.  Morris, 379 F.3d at 204-05.

It is clear that each of these evidentiary rulings raises a distinct claim of a constitutional violation.  The claim that the trial court excluded Dr. Bernstein's testimony does not merely supplement the other claims; it is a separate claim unto itself.  Therefore, Pierce failed to exhaust this claim in state court.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims.  Rose v. Lundy, 455 U.S. 509 (1982).  Such a result in this case, however, would be futile because Petitioner's unexhausted claim would be

-44-

procedurally barred as an abuse of the writ under Texas law. A procedural bar for federal habeas review occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred. <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. TEX.CODECRIM.PROC.ANN. art. 11.071 § 5(a) (Vernon Supp. 2002). The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

<u>Id</u>. The TCCA applies its abuse of the writ doctrine regularly and strictly. <u>Fearance v. Scott</u>, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Petitioner does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the factual basis for the claim did not exist, or that he is actually innocent. Therefore, Petitioner's unexhausted claim does not fit

-45-

within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts.  <u>Coleman</u>, 501 U.S. at 735 n.1.  That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice.  <u>Id</u>. at 750.  Pierce makes no showing of cause for his default.

A "miscarriage of justice" means actual innocence.  <u>Sawyer v. Whitley</u>, 505 U.S. 333, 335 (1992).

To show actual innocence,

> [T]he prisoner must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

<u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 455 n.17 (1986).  More succinctly, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the evidence now presented.  <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).

Dr. Bernstein's testimony might have cast some doubt on the reliability of the witness identification.  In light of the fact that four eyewitnesses identified Pierce, three of whom had seen Pierce before the murder, along with the evidence that Pierce was

seen earlier in the day wearing the same shirt worn by the shooter, Dr. Bernstein's proposed testimony was not so strong as to raise a "fair probability" that the jury would have found Pierce not guilty. Therefore, this court cannot consider this portion of Pierce's claim.  Moreover, even if the court were to consider the claim, the court would not conclude that the TCCA was unreasonable in holding that Dr. Bernstein's testimony was properly excludable.  <u>Pierce</u>, 777 S.W.2d at 414-16.

## F.   Failure To Suppress Identification Evidence

In his sixth claim for relief, Pierce contends that the lineup in which he was identified was unduly suggestive.  Pierce brought a pretrial motion to suppress the identifications, but the trial court never ruled on the motion.  Four witnesses, George and Reginald Sanders, Ronald Cooks, and Brenda Charles, identified Pierce as the shooter.  Prior to the lineup, the police told the witnesses that they had the suspect in custody.  VI Tr. at 251.

Pierce contends that he was the only person in the lineup who closely resembled the suspect described by witnesses.  He was the youngest person in the array.  At 5'5" tall, he was about two inches taller than the suspect described by one of the witnesses.  The other four people in the array ranged in height from 5'6" to 5'10" Pierce was 18 years old at the time of the lineup.  The others in the array were 22, 32, 34 and 34 years old, respectively.  VI Tr. at 267-68.  The 22 year old was four inches taller and 20 pounds

-47-

heavier than Pierce.  Pierce was clean-shaven.  The only other clean-shaven person in the array was 40 pounds heavier and 16 years older than Pierce.

Brenda Charles, an employee of the restaurant, saw the shooter and his clothing.  She identified Pierce in the lineup and identified his shirt as the one worn by the shooter.  She also testified that Pierce was in the restaurant on at least one occasion prior to the shooting.  She again identified Pierce at trial.  SH1. at 466-67.

Ronald Cooks also worked at the restaurant.  He was unable to identify Pierce's shirt, but identified Pierce in the lineup and at trial.  Id.

Reginald Sanders testified that he saw the shooting through a window.  He saw Pierce run out of the restaurant after the shooting. He also testified that he knew Pierce because they lived in the same apartment complex.  Sanders saw Pierce earlier in the day, and Pierce wore the same shirt as the shooter.  Sanders originally told the police that James Pierce, Pierce's brother, was the shooter. He explained that he knew Pierce by sight, but not by name.  The police determined that Pierce, and not his brother, was the shooter because James was in California at the time.  Sanders identified Pierce in the lineup and at trial.  Id. at 467-68.  George Sanders, Reginald's brother, gave substantially the same testimony as his brother.  Id. at 468. The state habeas court found that the lineup was not improperly suggestive.  Id. at 469.

-48-

> In determining whether a conviction must be
> reversed because the State employed improper
> pretrial identification procedures, the
> appropriate inquiry is whether the pretrial
> identification was so unnecessarily suggestive
> and conducive to irreparable mistaken
> identification that the defendant was denied
> due process of law. We employ a two-part test
> in implementing this standard: first, whether
> the identification procedure was impermissibly
> suggestive; and second, if so, whether there
> was a substantial likelihood of
> misidentification.

Lavernia v. Lynaugh, 845 F.2d 493, 499 (5th Cir. 1988).

The Supreme Court has noted several factors relevant to determining the reliability of an identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

In this case two of the witnesses were working in the restaurant during the robbery and murder. One of the witnesses testified that she had seen Pierce in the restaurant prior to the murder. These two witnesses had ample opportunity to observe Pierce during the robbery.

Two of the other witnesses knew Pierce by sight, though not by name, because they lived in the same apartment complex. Several of the witnesses identified Pierce's shirt, and at least one of the witnesses saw Pierce wearing the shirt earlier in the day. All

-49-

expressed certainty about the identification. Under these circumstances, the identifications had sufficient indicia of reliability to satisfy the Biggers standard.

Pierce also contends that the witnesses' in court identifications were tainted by the lineup.

> [C]onviction based on eyewitness identification at trial following a pretrial identification . . . will be set aside . . . only if the . . . identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Simmons v. United States, 390 U.S. 377, 384 (1968). Because the lineup identifications had sufficient indicia of reliability, there was not a substantial likelihood of irreparable misidentification at trial.

## G. Ineffective Assistance Of Counsel In Failing To Exclude Identification Evidence

In his seventh claim for relief Pierce contends that his trial counsel rendered ineffective assistance by not pressing his motion to suppress the lineup identifications. As discussed above, the lineup did not violate Pierce's rights. Counsel's failure to raise a meritless claim did not constitute deficient performance. See, e.g., Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

**H.   Failure To Suppress Evidence Obtained As A Result Of Arrest**

In his eighth claim for relief Pierce contends that his arrest was not based on probable cause and was therefore illegal.   He contends that the trial court should have suppressed all evidence flowing from the arrest.

The state habeas court found that this claim was procedurally defaulted because Pierce did not object at trial.[10]   The court also entered extensive findings of fact and concluded that the arrest was not illegal.   SH1. at 464-66, 499.

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Stone v. Powell, 428 U.S. 465, 494-95 (1976) (footnotes omitted). Pierce argues that the state habeas process was so flawed that he did not have a full and fair opportunity to litigate this issue. Even if his contention is credited, Pierce's argument ignores the fact that he could have moved at trial to suppress the evidence.

> An "opportunity for full and fair litigation" means just that: an opportunity.   If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

[10]   Quarterman does not now argue that this claim is procedurally defaulted.

Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978).  Because Pierce had at least one opportunity to litigate this claim in state court, the claim is not cognizable on federal habeas corpus review.

**I.   Ineffective Assistance Of Counsel**

In his ninth claim for relief Pierce argues that his trial counsel rendered ineffective assistance by failing to seek suppression of evidence obtained as a result of Pierce's arrest. Pierce notes that his counsel requested an instructed verdict based on his claim that his arrest was illegal.  He also requested a jury instruction that the jury should determine whether probable cause for the arrest existed and, if not, whether the evidence should be considered.  The trial court denied both requests.  VI Tr. at 747-51.  Pierce now states that "[i]f these actions were not sufficient to preserve the illegal arrest issue for habeas corpus, and the issue is procedurally defaulted, then counsel rendered ineffective assistance . . . ."  Am. Pet. at 106.

As noted above, the state habeas court found that Pierce defaulted his illegal arrest claim.  The court nonetheless also addressed the merits of the claim and denied relief.  SH1. at 464-66, 499.  Therefore, any failure to preserve the issue did not prejudice Pierce because the state habeas court reviewed the claim on the merits.  Because he suffered no prejudice, Pierce cannot show that he received constitutionally ineffective assistance of counsel under Strickland.

To the extent that Pierce claims ineffective assistance on the ground that counsel should have won a suppression motion at trial, he again fails to demonstrate prejudice. The state habeas court found that the Sanders brothers, both of whom knew Pierce by sight, both told the police that the shooter was one of the Pierce brothers and described the clothing worn by the shooter. SH1. at 467-68. Based on this information, there is little chance that Pierce would have prevailed on a suppression motion. "When judged in accordance with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act, the arrest . . . [was] reasonable under the Fourth Amendment." Hill v. California, 401 U.S. 797, 804-05 (1971) (citation and internal quotation marks omitted). Therefore, any suppression motion would have been futile. Counsel was not ineffective for failing to bring a futile motion. Koch, 907 F.2d at 527.

## J. **Brady Claims**

In his Tenth claim for relief Pierce contends that the prosecution failed to disclose several pieces of information helpful to the defense. In particular, Pierce alleges that: (1) the Sanders brothers were paid $1,000 for their identification of Pierce and testimony against him; (2) Orlester Jackson had charges against him dropped in exchange for his testimony against Pierce; (3) the police failed to turn over booking records showing, based on trace metal tests, that Pierce had not handled a gun on the night of the murder;

-53-

and (4) the State failed to produce Pierce's juvenile records containing useful mitigation evidence.

Pierce requested discovery on his <u>Brady</u> claims during the state habeas proceeding, but the state habeas court never ruled on his motion.  The court then entered findings of fact and concluded that no <u>Brady</u> material was withheld.

Pierce filed a discovery motion in connection with this federal habeas petition.  This court granted limited discovery.  Based on this discovery, Pierce filed a supplemental petition concerning his <u>Brady</u> claims.  Evidence obtained through discovery is attached to the supplemental petition.  In addition, Pierce filed a motion to expand the record to include an affidavit by one of his trial attorneys.  That motion was granted in part, and the record was expanded to include those portions of the affidavit pertaining to the <u>Brady</u> claims.

    1.   <u>The Brady Standard</u>

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004) (citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)). In <u>Strickler v. Greene</u>, the Supreme Court framed the three components or essential elements of a <u>Brady</u> prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

-54-

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Banks, 540 U.S. at 691 (quoting Strickler, 527 U.S. 263, 281-82 (1999)).

    2.   Payment To The Sanders Brothers

In response to Pierce's discovery request, the State produced an affidavit by Lynn P. Hardaway, an Assistant District Attorney in Harris County. Supp. Pet. at Ex. A. Ms. Hardaway states that she searched her office's files on Pierce's case for material responsive to the discovery request. She produced a February 2, 1978, letter from Detectives J.T. Bonds and W.C. Wendel to Larry Gustafson, Security and Safety Manager for Church's Fried Chicken (Supp. Pet. at Ex. B), an April 6, 1978, letter from Assistant District Attorney Bob Burdette to Chief Harry Caldwell of the Houston Police Department (Ex. C), a one page handwritten note with the notation "11/28" at the top (Ex. D), and a one page handwritten note with the notation "Larry Gustafson" at the top (Ex. E).

The letter to Larry Gustafson identifies three "young men who played a key role in the arrest and conviction of . . . Anthony Pierce." Two of the young men are the Sanders brothers. The other is Derwin Bankett, who pointed out to Reginald Sanders that James Pierce was in California and could not have committed the murder. The letter to Chief Caldwell also commends the Sanders brothers and Bankett for their roles in Pierce's arrest, conviction, and sentence.

The handwritten note apparently dated "11/28" contains the following notation: "Is there reward for this killing?  Reward goes to two brothers as soon as it goes to trial."

The other handwritten note contains the following notation: "Reward $1,000 split between Reg. & Geo Sanders Derwin Bankett each got $333.00."

Applying the test laid out in Strickler, this evidence was useful impeachment evidence, and it was suppressed, either willfully or inadvertently, by the State.[11]  The issue is whether the evidence was material, i.e., whether the nondisclosure prejudiced Pierce. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).  The question is whether, given the non-disclosures of material evidence, the verdict is less worthy of confidence.

Pierce correctly points out that little physical evidence linked him to the murder.  Thus, the testimony by the eyewitnesses was crucial to the State's case.  This fact argues in favor of materiality.  Other factors, however, weigh against finding the evidence material.

---

[11]     While the handwritten notes are undated, the two letters produced by the Harris County District Attorney's office are both dated in 1978.  This petition arises out of Pierce's third trial, which occurred in 1986.  It is therefore clear that these documents existed by the time the Sanders brothers testified in Pierce's third trial.

First, the Sanders brothers identified Pierce as the shooter very shortly after the murder.  Pierce claims that the Sanders brothers originally identified someone else but were persuaded to change their identification by Derwin Bankett.  That argument misstates the facts.  Reginald Sanders testified that he knew most of the Pierce brothers, though he did not know Anthony Pierce by name.  He originally said that James was the robber.  After Bankett told Sanders that James Pierce was in California, Sanders realized that Anthony was the shooter.  Sanders also saw Pierce's unique shirt, and had seen Pierce wearing the same shirt earlier in the day.  VI Tr. at 154.

Second, two other eyewitnesses also identified Pierce as the shooter.  One of those witnesses, Brenda Charles, had seen Pierce in the restaurant on at least one occasion prior to the shooting.

The State's failure to disclose the evidence that the Sanders brothers received a reward is troubling.  But considering that the Sanders brothers gave substantially consistent information to the police very shortly after the murder and that two other eyewitnesses also identified Pierce as the shooter, this court concludes that there is not a reasonable probability that disclosure of this evidence would have changed the outcome of the trial.

3.  <u>Juvenile Records</u>

Pierce contends that information about his background contained in his juvenile records would have had mitigating value.  He produces no specific evidence that the records actually contained

such information.   Moreover, information about his troubled
upbringing and health problems in youth was known to Pierce.   The
state bears no responsibility to direct the defense toward
potentially exculpatory evidence that either is in the possession of
the defense or can be discovered through the exercise of reasonable
diligence.   Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997),
cert. denied, 522 U.S. 1120 (1998).

### 4.   Orlester Jackson

Pierce also claims that the State dropped charges against
Orlester Jackson in exchange for testimony.   He produces no evidence
to support this claim.   A claim that is largely speculative with
respect to the effect of the allegedly exculpatory evidence on the
jury's ultimate determination of guilt or innocence cannot support
a Brady violation.   See Medellin v. Dretke, 371 F.3d 270, 281 (5th
Cir. 2004).

### 5.   Arrest Reports

Pierce contends that the police suppressed arrest reports
showing that trace metal tests performed on his hands shortly after
his arrest were negative, suggesting that he did not handle a gun
that night.   Again, Pierce offers no evidence that such reports
exist.   Therefore, this claim is speculative.   Moreover, a Houston
Police Officer testified at trial that tests on only one of Pierce's
hands were negative; the left hand returned a positive result.   The
officer also testified that Pierce was fingerprinted before the
trace metal test was performed, and that fingerprinting can cause a

-58-

false negative result.  VI Tr. at 297-305.  This mitigates the exculpatory value of the reports, and renders the reports duplicative of the testimony.  In light of the positive result on Pierce's left hand, the eyewitness identifications, and the explanation of why the test could be negative even if Pierce handled a gun, there is not a reasonable probability that these reports, even if they exist, would have changed the outcome of the trial.

**K.   Consideration Of Extraneous Information**

In his eleventh claim for relief Pierce states that Reginald Sanders testified that he saw Pierce commit the murder by viewing a reflection in the restaurant window.  Pierce claims that one of the jurors performed an out-of-court experiment to analyze Sanders's testimony.  Pierce also claims that the jurors discussed the fact that Pierce did not testify and that one juror based his decision to convict partially on the fact that Pierce did not testify.  Pierce further contends that the jury considered that fact that Pierce was previously tried twice and consulted a dictionary to define the term "deliberate" in the first special issue.  The state habeas court rejected this claim for lack of proof.  SH1. at 474, 501.

Pierce points to no evidence supporting any of these claims. Therefore, Pierce is not entitled to relief on this claim.  See Johnson v. Scott, 68 F.3d 106, 112 (5th Cir. 1995), cert. denied, 51 U.S. 1122 (1996).

**L.   Evidence Of Prior Unadjudicated Acts**

In his twelfth claim for relief, Pierce contends that the trial court improperly admitted evidence of unadjudicated prior offenses, some of which occurred when Pierce was a juvenile.  "[T]here is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated, criminal conduct."  Brown v. Dretke, 419 F.3d 365, 376 (5th Cir. 2005), cert. denied, 546 U.S. 1217 (2006); see also Williams v. Lynaugh, 814 F.2d 205, 208 (5th Cir.) ("the admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eight and fourteenth amendments"), cert. denied, 484 U.S. 935 (1987).

**M.   Witherspoon**

In his thirteenth and final claim for relief, Pierce contends that the trial court improperly granted the State's challenge for cause to one prospective juror, Helen Curtis Scott.  During *voir dire*, Scott stated that she did not think she could answer the special issues in a way that would result in a death sentence.  IV Tr. at 1143-44.  She later stated that "I feel if a person do[es] wrong, they should be punished; but I also feel that I wouldn't like for it to be me to have to pass that decision."  Id. at 1147. Later, the following colloquy occurred between Scott and the prosecutor:

> Q.   Now, you've told us of your very strong beliefs on the
>      death penalty and I'm asking you now that if you were

serving – let's say you ended up for some reason on a jury
on the capital murder case and you got to the punishment
stage.  You're given these questions to look at.  Would
you say to yourself because of your own opinions and
beliefs that I don't care what the State has brought on
these questions and, of course, the State has to try to
convince you beyond a reasonable doubt to answer those
questions yes.  And let's say the State has brought
evidence in there that really convinces you that those
questions should be yes.  Would you say to yourself, "If
I say yes, he's going to get death.  I'm morally opposed
to it, consciously opposed to it, so I'm to say no
regardless of the situation just so he does not get
death."  Would you do that?

A.   Yes, I would.

IV Tr. at 1155-56.  She equivocated a bit later:

Q.   I'm saying that if you had to answer that yes or no in a
situation and you're on the jury, what would your answer
be?  Could you answer that "yes" or "no" or would you
always answer it "no"?

A.   Well, you don't ever know what a person is going to do.
Sometimes people change, but if the person seems that
they're not going to change, you know, there's just no
hope for them, I would say the answer would be yes.

Id. at 1159.  She later stated that she "probably couldn't live with

my conscience, but I am sure I could [answer 'yes']."  Id. at 1163.

Scott and defense counsel had the following exchange:

Q.   And then you said something else – and correct me if I'm
wrong – "I have a conscience," you said, "but I think if
I was sitting on a jury and doing my duty as a law abiding
citizen, I could answer the question based upon the facts
and the evidence of the case."  Do you remember that you
said that when you answered yes a couple of times?  Do you
remember that?

A.   Okay.  Actually what I meant was if you found out that a
person is not going to do right, you can give up on
people.

Q.   And you could answer yes under those circumstances?

-61-

A.   Yes, I could.

Id. at 1174.   The State challenged Scott for cause and the trial court granted the challenge.   The TCCA held that the trial court did not abuse its discretion.   Pierce v. State, 777 S.W.2d at 404.

In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court noted that

> [a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. But a jury from which all such men have been excluded cannot perform the task demanded of it.

Id. at 519.   Accordingly, the Court held that

> a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

Id. at 522.   In Adams v. Texas, 448 U.S. 38, 45 (1980), the Court clarified that Witherspoon established "the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror . . . ."

In this case, Scott stated that she could not vote for the death penalty.   Under further questioning, she equivocated a bit and stated that she could do so if she was convinced that the defendant would not change, but that even then, she "probably couldn't live with my conscience."

At the outset, it should be noted that the jurors would not be asked to decide if Pierce would or would not change, but whether he posed a future danger to society.  Thus, even in her more equivocal answers, Scott never stated that she could answer "yes" to the special issues she would actually be asked to answer.

In any case, Scott's ambivalence on her ability to answer the special issues honestly if an honest answer meant a death sentence is evident even in her more equivocal answers.  While these answers could be read to mean that she believed she could answer yes, the trial judge was in a position to observe Scott and hear her tone of voice.  Based on her at best equivocal answers and the trial court's opportunity to observe Scott, the state court's conclusion that Scott would be substantially impaired in the performance of her duties as a juror was not unreasonable.

## IV. <u>Certificate of Appealability</u>

Pierce has not requested a certificate of appealability ("COA"), but this court may determine whether he is entitled to this relief in light of the foregoing rulings. <u>See</u> <u>Alexander v. Johnson</u>, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA <u>sua sponte</u>.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court

will not consider a petitioner's request for a COA until the district court has denied such a request.  See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further."  Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir.), cert. denied, 531 U.S. 966 (2000).  "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000), cert. dismissed, 531 U.S. 1134 (2001).

This court has carefully considered each of Pierce's claims and concludes that each of the claims, with the exception of Pierce's Penry claim, is foreclosed by clear, binding precedent.  This court grants relief on the Penry claim.  As to Pierce's other claims, the court concludes that Pierce has failed to make a "substantial

-64-

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

## V.   Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1.   Respondent Nathaniel Quarterman's Motion for Summary Judgment(Docket Entry No. 12) is **GRANTED IN PART AND DENIED IN PART**;

2.   Petitioner Anthony Leroy Pierce's Amended Petition for a Writ of Habeas Corpus (Docket Entry No. 8) is **GRANTED IN PART AND DENIED IN PART**;

3.   Pierce's Amended Petition and Counter-Motion For Partial Summary Judgment (Docket Entry No. 15) are **GRANTED** as to his Penry claim (Claim A);

4.   Pierce's Amended Petition is **DISMISSED WITH PREJUDICE** as to all of his other claims;

5.   Respondent shall release Pierce from his confinement, unless within 120 days of entry of this Order, the State grants Pierce a new sentencing hearing or resentences him to a sentence less than death in accordance with Texas law in effect at the time of Pierce's crime;

6.   A Certificate of Appealability is **DENIED;** and

7.   The relief granted in paragraph 5 of this Order is **STAYED**

pending final resolution of all appeals from this Order.


**SIGNED** at Houston, Texas, on this the 26th day of September, 2008.


_____
                  SIM LAKE
       UNITED STATES DISTRICT JUDGE